# UNITED STATES DISTRICT COURT

for the

Southern District of Illinois

FILED

DEC 29 2016

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

KENNETH HOUCK, pro se, )
_____ )  Case Number:    16-1396-JPG
_____ )              _____
_____ )                (Clerk's Office will provide)
                       )
_____ )
     *Plaintiff/Petitioner(s)*      )  ☐ CIVIL RIGHTS COMPLAINT
         v.            )  pursuant to 42 U.S.C. §1983 (State Prisoner)
UNITED STATES OF AMERICA, A. MAR- )
QUEZ, AW SLOOP, CO JOHN DOE 1, CO )  ☒ CIVIL RIGHTS COMPLAINT
JOHN DOE 2, CO LANG, CO WOOLRIDGE, )  pursuant to 28 U.S.C. §1331 (Federal Prisoner)
DR. COOK-SOMP COORDINATOR, DR. J. )  ☒ CIVIL COMPLAINT
     *Defendant/Respondent(s)*      )  pursuant to the Federal Tort Claims Act,
                       )  28 U.S.C. §§1346, 2671-2680, or other law
-CONTINUED...-

## I.    JURISDICTION

Plaintiff:

A.    Plaintiff's mailing address, register number, and present place of
      confinement.
      KENNETH HOUCK #06743-015
      U.S. Penitentiary
      PO Box 1000
      Marion, IL 62959

Defendant #1:

B.    Defendant  Ms. Maureen Baird                    is employed as
               (a)      (Name of First Defendant)

              Warden
               (b)           (Position/Title)

with  U.S. Penitentiary Marion, 4500 Prison Rd., PO  Box
               (c)      (Employer's Name and Address)

      2000, Marion, IL 62959

At the time the claim(s) alleged this complaint arose, was Defendant #1
employed by the state, local, or federal government?    ☒ Yes    ☐ No

If your answer is YES, briefly explain:
Yes, Ms. Baird was an employee of the FBOP, and has
recently left the institution (retired).

**Defendant #2:**

C.    Defendant  Dr. Randall Pass                    is employed as

(Name of Second Defendant)

Clinical Director/Primary Care Physician

(Position/Title)

with  U.S. Penitentiary Marion, 4500 Prison Rd., PO Box

(Employer's Name and Address)

2000, Marion, IL 62959

At the time the claim(s) alleged in this complaint arose, was Defendant #2 employed by the state, local, or federal government?    ☒ Yes    ☐ No

If you answer is YES, briefly explain:

Dr. Pass was, and is still, the current Clinical Director at the institution.

**Additional Defendant(s) (if any):**

D.    Using the outline set forth above, identify any additional Defendant(s).

see attached

## II.  PREVIOUS LAWSUITS

A.  Have you begun any other lawsuits in state or federal court relating to your imprisonment?  ☒ Yes  ☐ No

B.  If your answer to "A" is YES, describe each lawsuit in the space below. If there is more than one lawsuit, you must describe the additional lawsuits on another sheet of paper using the same outline. <u>Failure to comply with this provision may result in summary denial of your complaint.</u>

1.  Parties to previous lawsuits:
Plaintiff(s):    self;  Kenneth Houck


Defendant(s):  USA, Maureen Baird, J.M. Powers, Mr. Sloop, Captain Lepe, Lt. Mash, Lt. John Doe 1, DHO Ms. G. Crews, Lt. May, CO Martin, Mr. Weasel, (reserved).

2.  Court (if federal court, name of the district; if state court, name of the county):
United States District Court  for the Southern Dist. IL.
3.  Docket number:
16-1268-JPG
4.  Name of Judge to whom case was assigned:
JPG
5.  Type of case (for example: Was it a habeas corpus or civil rights action?):

Prisoner Complaint/Civil Rights/Civil Violations

6.  Disposition of case (for example: Was the case dismissed? Was it appealed? Is it still pending?):   pending


7.  Approximate date of filing lawsuit:
approximately November 2016
8.  Approximate date of disposition:
?

3.2

## II. PREVIOUS LAWSUITS

A.  Have you begun any other lawsuits in state or federal court relating to
    your imprisonment?                    ☒ Yes    ☐ No

B.  If your answer to "A" is YES, describe each lawsuit in the space below.  If
    there is more than one lawsuit, you must describe the additional lawsuits
    on another sheet of paper using the same outline.  <u>Failure to comply with
    this provision may result in summary denial of your complaint.</u>

1.  Parties to previous lawsuits:
    Plaintiff(s):
                    self, Kenneth Houck


    Defendant(s):   USA, Deborah Denaham, Dr. T. Kraus,
    Dr. Malanowski, Kristen Kruger.


2.  Court (if federal court, name of the district; if state court, name of
    the county): United States District Court fot the Dist.
    of Colorado.

3.  Docket number:

    1:15-cv-00894-KMT
4.  Name of Judge to whom case was assigned:

    Kathleen M. Tafoya
5.  Type of case (for example: Was it a habeas corpus or civil rights
    action?):
    civil rights and FTCA

6.  Disposition of case (for example: Was the case dismissed?  Was it
    appealed?  Is it still pending?):   pending


7.  Approximate date of filing lawsuit:
                                        June 2015
8.  Approximate date of disposition:
                                        unknown

3.2

3.2

3.2

III.    **GRIEVANCE PROCEDURE**

A.    Is there a prisoner grievance procedure in the institution? ☒ Yes    ☐ No

B.    Did you present the facts relating to your complaint in the prisoner
grievance procedure?                                                    ☒ Yes    ☐ No

C.    If your answer is YES,
1.    What steps did you take?

```
Filed Administrative Remedies, from informal request for
resolution through the local, regional and central office
levels.
```

2.    What was the result?

```
Denied all of my claims
```

D.    If your answer is NO, explain why not.

E.    If there is no prisoner grievance procedure in the institution, did you
complain to prison authorities?    n/a                    ☐ Yes    ☐ No

F.    If your answer is YES,
1.    What steps did you take?

2.    What was the result?

G.    If your answer is NO, explain why not.

H.    Attach copies of your request for an administrative remedy and any
response you received. If you cannot do so, explain why not:

```
documentation is substatially volumous
```

## IV. STATEMENT OF CLAIM

A. State here, as briefly as possible, when, where, how, and by whom you feel your constitutional rights were violated. Do not include legal arguments of citations. If you wish to present legal arguments or citations, file a separate memorandum of law. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. If your claims relate to prison disciplinary proceedings, attach copies of the disciplinary charges and any disciplinary hearing summary as exhibits. You should also attach any relevant, supporting documentation.

This civil action is being filed on behalf of violations to Plaintiff's civil rights, including Cruel & Unusual Punishment, Freedom of Speech, Due Process and others, as well as various state tort claims. (see attached complaint)

## V.    REQUEST FOR RELIEF

State exactly what you want this court to do for you. If you are a state or federal prisoner and seek relief which affects the fact or duration of your imprisonment (for example: illegal detention, restoration of good time, expungement of records, or parole), you must file your claim on a habeas corpus form, pursuant to 28 U.S.C. §§ 2241, 2254, or 2255. Copies of these forms are available from the clerk's office.

```
Plaintiff asks this Honorable Court to award Plaintiff
$1,000,000 compensatory, $1,000,000 punitive and $1.00
nominal damages for each constitutional violation committed
for each defendant involved, and likewise for each tortious
violation perpetrated by each individual named.
-see attached complaint-
```

## VI.    JURY DEMAND *(check one box below)*

The plaintiff ☒ does ☐ does not request a trial by jury.


## DECLARATION UNDER FEDERAL RULE OF CIVIL PROCEDURE 11

I certify to the best of my knowledge, information, and belief, that this complaint is in full compliance with Rule 11(a) and 11(b) of the Federal Rules of Civil Procedure. The undersigned also recognizes that failure to comply with Rule 11 may result in sanctions.


Signed on: _December 23, 2016_
(date)

_Signature of Plaintiff_

U.S. Penitentiary
Street Address

Kenneth Houck
Printed Name

4500 Prison Rd., PO Box 1000
Marion, IL 62959
City, State, Zip

#06743-015
Prisoner Register Number

_____
Signature of Attorney (if any)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KENNETH HOUCK, pro se,<br>        Plaintiff,<br><br>    V.<br><br>UNITED STATES OF AMERICA, et al.<br>MAUREEN BAIRD, Warden<br>DR. RANDALL PASS, Clinical Director, M.D.,<br>AW SLOOP, Assistant Warden,<br>CO WOOLRIDGE, Correctional Officer,<br>CO JOHN DOE 1, Correctional Officer,<br>CO JOHN DOE 2, Correctional Officer,<br>CO LANG, Recreation Officer,<br>A. MARQUEZ, SOMP Staff-Psychology Dept,<br>DR. COOK, SOMP Coordinator,<br>DR. J. WEBER, SOMP Psychologist,<br>LT. JOHN DOE 1, Custody Lieutenant,<br>LT. DELOIA, Custody Lieutenant,<br>MR. MEADE, Education Tech,<br>MS. BAGWELL, Health Services Administrator,<br>MS. LESLIE BROOKS, Physician's Assistant,<br>MS. CASTELLANO, Education Supervisor,<br>MS. G. CREWS, Disciplinary Hearing Officer,<br>MS. HARBISON, Assistant Health Svcs Admin,<br>(RESERVED),<br>        Defendants. | Case No.:_____<br><br>PRISONER COMPLAINT<br><br>-CIVIL ACTION-<br><br>with<br>**JURY DEMAND** |

INITIAL COMPLAINT WITH JURY DEMAND

## I. INTRODUCTION

This civil rights complaint is brought by the Plaintiff, Kenneth Houck, pro se, a federally incarcerated individual at the U.S. Penitentiary Marion, for the damages and relief where he alleges various constitutional violations of his civil rights according to the statutes set forth, as well as the tortious violations causing damages and their corresponding state claims.

# TABLE OF CONTENTS

I. INTRODUCTION.................................................1

ACRONYMS USED WITHIN TEXT....................................ii

II. JURISDICTION & VENUE......................................2

III. PARTIES.................................................2

IV. STATEMENT OF FACTS
A. SOMP RELATED FACTS
1. CORRECTIONAL MANAGEMENT PLANS.............................4

2. PEN-PAL DISPUTE...........................................6

3. POLICY STANDARDS..........................................9

4. CENSORSHIP...............................................10

5. INACCURATE SOMP RECORDS..................................10

6. PHOTOS/SEXUAL HARRASSMENT................................11

7. INTER-LIBRARY LOAN DISCRIMINATION........................16

B. MEDICAL RELATED FACTS
1. INACCURATE MEDICAL RECORDS...............................18

2. DISCONTINUANCE OF REQUIRED MEDICATION....................21

3. DENIAL OF TREATMENT......................................23

4. DENIAL OF ACCESS TO THE COURTS..........................24

V. LEGAL CLAIMS.............................................26

VI. RELIEF..................................................32

## ACRONYMS USED WITHIN TEXT

| | |
|---|---|
| AHSA | Assistant Health Services Administrator |
| ARR | Administrative Remedy Request |
| BOP | Bureau of Prisons |
| CMP | Correctional Management Plan |
| CO | Correctional Officer |
| DHO | Disciplinary Hearing Officer |
| FCI | Federal Correctional Institution |
| FMC | Federal Medical Center |
| FOIA | Freedom of Information Act |
| HSA | Health Services Administrator |
| HTS | Hammertoe Syndrome |
| ILL | Inter-Library Loan |
| IRA | Initial-Risk Assessment |
| MDS | Medical Duty Status |
| SHU | Special Housing Unit |
| URC | Utilization Review Committee |
| USP | United States Penitentiary |

## II. JURISDICTION & VENUE

1.   The Court has jurisdiction over the Plaintiff's claims of violations of his constitutional rights, protected under 42 U.S.C. §§1331(1) and 1343, §1402, §1983, §2401)b), §2671-2680, 5 U.S.C. §301, 28 U.S.C. §501 et seq., 28 C.F.R. §14.

2.   The Court has supplemental jurisdiction over the Plaintiff's state law/common law tort claims under 28 U.S.C. §1367, 1346(b), 2679(d)(2).

3.   Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §2201 and 2202.

4.   Plaintiff claims for injunctive relief are authorized by 28 U.S.C. §2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure, 18 U.S.C. §3626.

5.   The Bureau of Prisons has possession and control of Plaintiff's records as well as a duty to maintain said records with accuracy per 5 U.S.C. §552.

6.   The Southern District of Illinois is an appropriate venue for this case to be heard under 28 U.S.C. §1391(b)(2) because it is where the events occurred which give rise to these claims herein.

## III. PARTIES

7.   Plaintiff, Kenneth Houck, is pro se, and was at all times during this complaint and where he was mentioned herein was a prisoner of the Department of Justice, in the Federal Bureau of Prisons, located at the United States Penitentiary, located at 4500 Prison Rd. (P.O. Box 1000), Marion, Illinois under the Reg. No. 06743-015.

8.   Defendant United States of America, is an entity of the government, whereby the government itself is the defendant of the tortious acts or ommissions.

9.   Federal Bureau of Prisons, is a government entity who has a duty to maintain records under its control with accuracy, to house a prisoner under their custody and care and protect said inmates from harms and ensure their well-being.

10.  A. Marquez, an employee working in the Psychology Department as a SOMP Specialist at USP Marion.

11.  AW J.M. Powers, Acting Warden of the USP Marion on several occassions during this complaint, is regularly employed as an Assistant Warden, (responsible for the operation and the welfare of all inmates within said prison.

12.  AW Sloop, was serving as acting Warden on several occassions during this complaint, and is regularly employed as an Assistant Warden at the Marion USP.

13.  CO John Doe 1, was an officer at the Marion USP, and was working in the west corridor for the purposes described in this complaint as it pertains to him.

14.  CO Jon Doe 2, was an officer at the Marion USP, and was working in the west corridor for the purposes described in this complaint as it pertains to him.

15.  CO Lang, Recreation Officer, was employed at the Marion USP during the time he is mentioned in this complaint.

16.  CO Woolridge, Housing Officer, worked in X-Unit on the night of the incident to which he is refered to in this complaint.

17.  Dr. Cook, SOMP Coordinator, who at all times mentioned in this complaint held the position over the management of sex-offenders at the Marion USP.

18.  Dr. J. Weber, who at all times mentioned in this complaint serves as a Sex-Offender Treatment Specialist or other functions on the SOMP program.

19.  Dr. Randall Pass, Clinical Director of the Marion USP Medical Department, and is also Plaintiff's Primary Care Physician, and at all times mentioned in this complaint was responsible for the Plaintiff's physical health care and medical needs.

20.  Lt. Brooks is at all times in this complaint a lieutenant at the Marion USP.

21.  Lt. John Doe 1, was at all times during this complaint serving as a lieutenant at the Marion USP.

22.  Lt. John Doe 2, was at all times during this complaint serving as a lieutenant at the Marion USP.

23.  Lt. Mash was at all times mentioned in this complaint serving as a lieutenant at the Marion USP.

24.  Lt. McMillon, was at all times mentioned in this complaint serving as a lieutenant at the Marion USP.

25.  Lt. Deloia, was at all times during this complaint serving as a lieutenant at the Marion USP.

26. Maureen Baird, is the Warden of the Marion USP, responsible for all of the inmates' safety and well-being, as well as to manage the orderly operation of the facility.

27. Mr. Meade, was at all times during this complaint was serving as an Education Tech at the Marion USP.

28. Ms. Bagwell, was at all times during this complaint was serving as the Health Care Administrator of the Marion USP and as an employee of the United States Public Health Service and is only liable for tortious violations.

29. PA Leslie Brooks, was at all times serving as a physician's assistant to the Clinical Director and is assigned to the Plaintiff as one of her patients and the first responder to Plaintiff's medical needs.

30. Ms. Castellano, serving as the Supervisor of Education during the entirety of this complaint.

31. Ms. G. Crews, serves as the Disciplinary Hearing Officer who appears via telephony from an undisclosed location within the North Central Region of the BOP.

32. Ms. Harbison, was at all times during this complaint serving as the Assistant Health Services Administrator of the Marion USP and is employed by the United States Public Health Services and is only liable for tortious violations.

33. SIS Lt. John Doe, is an SIS lieutenant during the entirty of this complaint.

34. Reserved. This is reserved for future and/or additional defendants if required.

## IV. STATEMENT OF FACTS

### A. SOMP RELATED FACTS

#### 1. CORRECTIONAL MANAGEMENT PLANS

35. CMPs are documents produced by Sex-Offender Management Program staff which outline certain restrictions that are in addition to the general population's rules to follow.

36. CMPs are supposed to be based on two factors (a) the offender's Pre-Sentencing Investigation Report (PSI) and his (b) "Intial Risk Assessment," according to the SOMP program statements and policy.

37. A "CMP" must relate to his "Initial-Risk Assessment," the Plaintiff's instant offense is Transportation of Child Pornography.

38. The stated purpose of a CMP being put into action is to "help change [Plaintiff's](and other sex-offender's) criminal lifestyles and become a law-abiding citizen with effective self-control skills,"

39. As claimed on the CMP, another of its proported 'purposes' is that it was developed for the Plaintiff from findings and determinations inserted into the Plaintiff's SOMP records from Englewood FCI.

40. CMPs inflict harsher treatment, scrutiny and restrictions upon sex-offenders in regard to what is allowed or restricted to them.

41. A CMP is to be considered a "personalized" management tool, tailored to each sex-offender's unique needs.

42. However, CMPs are actually made up of blanket statements of nearly identical clauses from accross the entire BOP.

43. These canned statements, clauses and restrictions are usually all-encompassing in all matters or topics, they essentially are rules used to incorporate into a sex-offender's day-to-day affairs.

44. Such controlling restrictions weigh in on all aspects of an inmates life, and said restrictions are used to toll against an entire class.

45. As sex-offenders make up a large percentage of the BOP population, a "sex-offender" is grouped into a class of it's own, where all members are identified by their charge in generic terms.

46. Likewise, sex-offenders are also categorized in the same manner, where they are looked down upon, and considered amongst inmates and the public alike as being the worst type criminals,

47. In prison they are segregated in all activities and suffer from discrimination and harsh treatment by inmates and staff, comparable to extreme racism.

48. Plaintiff's CMP from Englewood was initiated based upon falsely alleged possessions consisting of (a) sexually explicit letters and (b) numerous pictures of prepubescent children,

49. Plaintiff outright denies these allegations.

50. Plaintiff admits to possessing photos of clothed children, who were Plaintiff's own family members at a wedding party and

of his own family jumping off a large rock into a lake they were swimming at.

51. Although said photos were **NOT** inappropriate or sexual in nature, SOMP staff purposely miscategorized said photos.

52. Staff also over-inflated Plaintiff's records with erroneous false statements in regard to this 'incident.'

53. It was these notes and records that were tainted by staff at Englewood FCI,

54. One SOMP staff member was found to have committed "staff misconduct" in the process of corrupting Plaintiff's records.

55. Plaintiff is currently in litigation via civil suit to have said records expunged (in 10th Circuit District Court in Denver, CO, see 1:15-cv-00894-KMT.)

56. Plaintiff Houck arrived to Marion USP on or about August 3, 2015, while on a CMP from Englewood.

57. On or about 8/15/2015 Defendant Dr. J. Weber ("Weber") removed Plaintiff's CMP which had been initiated in Englewood.


2. PEN-PAL DISPUTE


58. The now pre-existing CMP ("OLD CMP") forbade Plaintiff from corresponding with pen-pals, despite...

   (a) Plaintiff's charge does not consist of communications or solicitations of a minor, by mail, email, or instant messaging, etc..

   (b) The charge of Transporation of Child Pornography, and the Plaintiff's conduct do not directly relate.

   (c) Thus, pen-pal correspondence does not support a claim of being "Risk-Relevant," which is the standpoint of the SOMP for this Plaintiff,

   (d) Nor does it relate to his IRA.

59. Plaintiff asserts his level of precaution taken when he placed his pen-pal ad, showed that his intentions were literally examples of 'model-like inmate behavior.'

60. To warn the potential pen-pal that Plaintiff wishes to remain on the 'legal-side' of all correspondence demonstrates responsible behavior of any offender, especially a sex-offender.

61.  However, this example was selectively spun into being deemed "risk-relevant" by SOMP staff, in spite of having no connection to Plaintiff's IRA or his criminal offense.

62.  Pen-pal letters are nothing more than personal communication with someone, and is a liberty interest, as well as a First Amendment right, protected by Due Process.

63.  Plaintiff continued his pen-pal activity as a hobby, at Englewood and Marion.

64.  Pen-pal activity promotes rehabilitation via interaction with individuals in the free-world, as well as can foster and promote relationships.

65.  Plaintiff even took extra, and non-required steps to warn in his ad, those whom want to correspond with him, "Not to discuss anything illegal" they may have done in their past.

66.  Dr. Weber acknowledged the Plaintiff taking said extra, additional steps but still saw his actions as deliberate intentional acts against his CMP.

67.  A _new_ and _additional_ "risk-assessment" was completed by Dr. Weber in September 2015 whereby she determined "Plaintiff clearly violated instructions of behavior by staff when they removed the [OLD] CMP placed on Plaintiff by Englewood staff," (reffering to her encouragement to refrain from corresponding to pen-pals).

68.  A _NEW_ "risk-assessment" was done and inserted NEW information into inmates records, therefore it could no longer be an "_Initial_" Risk Assessment.

69.  Defendant Weber still proceeded to put in place this new CMP.

70.  "On 9/18/2015 staff..found..[Plaintiff's] typed request _allegedly_ (personal pen-pal ad) for sexually explicit communications with foreign contacts through a pen-pal service."

71.  Dr. Weber described Plaintiff as having the "pre-occupation or interest in a group of people _soley_ because of them being generally a greater risk for exploitation."

72.  However, dating men of Asian or Hispanic ethnicities is NOT indicative of an automatic attempt to exploit a group that are "easily exploitable."

73.  Rather, that is an extremely broad/statement and refers to entire races of peiople that happen to be more than 4,500,000,000 Billion people.

74. Plaintiff placed an ad in a pen-pal booklet for gay men.

75. Plaintiff contends that his pen-pal publication subscription was not "sex-themed."

76. Plaintiff states that his assertions of being rightfully able to correspond with pen-pals is his First Amendment right.

77. Said right was substantiated when this restriction was not a stipulation of his NEW CMP, yet it had been the basis of issuing him the <u>NEW</u> CMP.

78. Therefore, it can be stated that the NEW CMP was set-up to assert authority and power over the Plaintiff where it is in violation of Plaintiff's First Amendment right, and is not supported by Plaintiff's IRA.

79. Plaintiff maintains being openly homosexual.

80. Plaintiff maintains being openly attracted to men of Asian and Hispanic origins.

81. Plaintiff maintains being gay and attracted to Asian and Hispanic men does not sufficiently make him, or fit into having the "pre-occupation or interest in a group because of their being of a group who are easily exploited."

82. Plaintiff has dated and partnered with only a few, but long-lasting, very meaningful relationships, ranging from 4-10 years in duration, with men of said ethnicities and origins.

83. Plaintiff contends that even if the publication was "sex-themed," prison officials cannot censor material just because it contains religious, philosophical, political, social **sexual or unpopular content.**

84. The BOP can only censor if they believe and can show that material may cause disorder or violence or will hurt a prisoner's rehabilitation via the "Turner-Test." (see <u>Turner v. Safley</u>, 482 U.S. 78 (1987).

85. Plaintiff reasserts that his offense is for transporting pornography across state-lines, not for communication and/or inducement for sexual acts.

86. As such, communication with other adults does not reflect Plaintiff's rehabilitation.

87. Said publication is a legitimate pen-pal resource offered by the Three-G ("3-G") Company Worldwide, P.O. Box 1022, Canfield, OH 44406.

88. 3-G only allows listings from individuals over the age of 21.

8

89.  3-G maintains the right to edit or remove any (inappropriate) ad at their discretion, based upon their own declaration printed in their booklets.  For example, "Can reject advertising for anything illegal."

90.  3-G also requires a signed statement including one's name, address and age, as well as a declaration that they are "of legal age and want to receive adault material."

91.  Weber indicated to the Plaintiff she found he was offending "OLD restriction" from his PREVIOUS Englewood CMP" and that therefore "was assumed to be taking advantage of her having dropped Plaintiff's Englewood's CMP."


### 3. POLICY STANDARDS


92.  After receiving the September 2015 (NEW) CMP, Plaintiff openly and formally questioned the Bureau of Prisons (BOP) of the information of its policies and factual interpretations used in the developement of their SOMP rules.

93.  Plaintiff requested the citied books, and materials, used by the BOP to have formulated the basis of thier SOMP policy.

94.  Said policies were formulated from said research and were used to manage the inmate population of sex-offenders.

95.  Plaintiff was denied said research materials he asked for on all requests for information, including formal and informal requests.

  (a) Plaintiff requested detailed research information from
      Dr. Cook (see ARR #840798).
  (b) Plaintiff also submitted a Freedom of Information request
      to the Bureau of Prisons.

96.  Plaintiff's request for the research material (including a FOIA request and an informal request to Dr. Cook) were categorically denied.

97.  Plaintiff expected Dr. Cook to supply the information in Good-Faith, if he whole-heartedly believed everything he spoke of, so far as how the BOP came to rely on said research for deriving their theories, structure, teachings, education, policies, discipline, etc...of SOMP/SOTP programs and policies, however, all such requests continued to be refused.

98.  The BOP maintains it is not mandated to provide or produce any such research or findings of the facts that were used to create its own policies that rule and manage sex-offender's lives, representing a very substantial part of the BOP population.

## 4. CENSORSHIP

99.  The 'Turner-Test' is used to determine whether something
is "reasonable" to possess, based on:

    (a) It will be ALLOWED if determined not to be detrimental
        to the security, good order or the institution or facil-
        itates criminal behavior.

    (b) possession of any kind of item will BE ALLOWED even
        if it is unpopular, repugnant, based on religious,
        philosophical, political, social, or sexual.

100. Plaintiff incorporates paragraphs 58 and 95 herein by reference
as fully set forth herein.

## 5. INACCURATE SOMP RECORDS

101. Plaintiff has asserted for year, both at Englewood and
Marion, that the falsehoods in his records, are "intentionally
placed inaccuracies" designed to convey the Plaintiff as anything
but normal and...

102. Said records are used to portray him as a deviant pervert
who "exhibits sexual behaviors and preoccupations different
than any acceptable standard."

103. Plaintiff contends that these types of inaccurate, yet
highly damagging comments to his records to go to show staff's
contempt for Plaintiff.

104. It further appears that staff is gearing up to 'civilly
commit' the Plaintiff,

105. and the false-inaccurate records will form the lynch-pin
for the government's case.

106. Plaintiff₂ claims of "staff misconduct" at Englewood were partially "sus-
tained" by an investigation done by SIS Lt. Kizer of Englewood
FCI.

107. Additionally, the DHO had expunged the incident report
(but not the Plaintiff's records) on staff's claims being unfounded
and where "staff misconduct" was committed.

108. These reasons demonstrate how Englewood's SOMP staff's
damaging mis-conduct in the past, has now affected the Plaintiff.

109. Thereby causing immediate and future harms, due to the
"bogus records" being maintained by BOP rather than corrected

10

or removed.

110. Said inaccurate reports were intentionally loaded into Plaintiff's records.

111. Such damaging data stored in the Plaintiff's records by SOMP staff have future repurcussions which are likely to be adverse to the Plaintiff, especially while dealing with SOMP staff at Marion and at future SOMP related requirements, such as during his probation period.

112. Plaintiff's corrupted records and statements by staff have been and continue to be points of contention, of heavy influence and persuation to staff reviewing the records and notes. To wit:

    (a) Plaintiff submitted an Administrative Remedy Request ("ARR") which was responded to by acting warden J.M. Powers.

    (b) In response was a direct rehashing of his corrupted records that had been tainted and ruined, and which were currently under litigation.

    (c) Where AW Powers based his position on more than 15 instances of highly contested examples taken from the inaccurate data stored in Plaintiff's SOMP records.

    (d) AW Powers relied upon information Plaintiff recognized to be the same information contained in the dispute currently before the U.S. District Court in Denver, CO before the Magistrate Judge Kathleen M. Latoya, regarding the corrupted information about the Plaintiff.

113. A further example, Plaintiff was written up several more times since September 2015 by SOMP staff that now think they have legitimate reason to believe that Plaintiff "is everything that was written about him by Englewood staff." (see exhibit #_____ ).

114. Additionally, false information creates a Title V claim and a Federal Privacy Act claim.

6. PHOTOS/SEXUAL HARRASSMENT

115. On 1/1/2016 Plaintiff received an incident report for prohibited acts #305 and #306 for the possession of "commercial photos," as well as not conforming to a "program."

116. Plaintiff purchased said photos from a company specializing in the selling of photos to inmates.

117. Plaintiff had purchased the photos from this publisher.

118. Said publisher makes sure to abide by the rules of the institutions they serve via the following pronouncements:

(a) Said publisher advertises that all of their photos were "BOP Friendly."

(b) That the photos were expressly "Non-nude."

(c) That the photos do NOT show any pubic area.

(d) That there is no simulated sex.

(e) That there is "no bodily fluids" shown.

(f) That there is no shear or see-through clothing"

119. Said publisher states that there is no cause for any mailroom to reject photos or from being banned in a BOP mailroom.

120. Photos were received in piece-meal,

121. A certain amount of photos were scrutinized, most being approved, but a few denied by the mailroom each day, then delivered to the Plaintiff.

122. The mailroom individually scrutinized and determined each of the photos to be proper, or not.

123. This process being completed by mailroom staff upon the arrival of Plaintiff's photo order does validate the assumption that any and all photos delivered to Plaintiff after said scrutiny, (and after any rejected photos are removed,) were determined to be "Non-risk relevant" and cleared for the Plaintiff's posses-sion.

124. Approximately 7-10 days after the photos in question were scrutinized, approved and delivered to the Plaintiff, the photos were confiscated by CO Lang, and given over to the lieutenant to process disciplinary actions.

125. Lt. Deloia took the pictures and called them "contraband."

126. Lt. Deloia shared his open disgust with Plaintiff by degrading him for being gay, and for collecting photos of male models.

127. Lt. Deloia asked Plaintiff "what would your poor mother say if she got these in the mail?..and went on to tell Plaintiff "he ought to be ashamed of himself."

128. Plaintiff disagreed, and then told the lieutenant "that there was nothing wrong with [said photos], and that they were totally permissable," (having been received through the institu-

tional mailroom and reviewed for policy compliance).

129. Plaintiff therefore refused to mail photos home as the lieutenant asked him to do.

130. Lt. Deloia then made another attempt to rid himself of the photos by trying to manipulate the Plaintiff into shredding the photos himself.

131. Said acts were actually extortion, whereby Lt. Deloia told the Plaintiff that he would not face an incident report ("a shot") if he agreed to shred all the photos right there at that moment.

132. Lt. Deloia was attempting to make this appear like the Plaintiff knew full well that these photos were contraband and that he was offering the Plaintiff a 'way-out' of getting into trouble for them if he just shredded them.

133. Plaintiff instructed Lt. Deloia to NOT destroy or dispose of the photos, as they were going to become evidence in a court proceeding and explained that he would be    seeing this issue through to its end.

134. Lt. Deloia was working on finding a legitimate reason to write-up the Plaintiff on an incident report.

135. After thinking about it, Lt. Deloia decided to change his reasoning for the confiscation of said photos.

136. At first the reason for Plaintiff to receive a shot was going to be for "running a business," a prohibited act inside prison.

137. Lt. Deloia, continuing to  search  for another reason, when he asked the Plaintiff if he was actually gay or just selling to the gays in the facility?

138. Plaintiff Houck confirmed to Lt. that he was indeed openly homosexual.

139. Learning that these photos were of all-male models (perceived to be gay) and that Plaintiff was himself gay made Lt. Deloia visibly  uncomfortable.

140. Lt. Deloia seemed angered when CO Lang informed the lieutenant that he did not want to personally write up the incident.

141. Lt. Deloia began to mock and belittle the Plaintiff for having the photos of male models and the appearance of the models being gay.

13

142. Lt. Deloia also did not want to write-up the Plaintiff himself, which seemed to renew his anger all over again.

143. Lt. Deloia continued to search for a way to get the Plaintiff a legitimate incident report issued,

144. so he had a brainstormed idea, and asked the Plaintiff if he was a sex-offender or not.

145. Once it was confirmed that Plaintiff was a sex-offender, Lt. Deloia said that he was going to forward the photos to Psychology Department (SOMP staff).

146. Lt. Deloia wondered out loud, "hopefully they can find some way to issue a shot for the photos."

147. At the point Lt. Deloia changed the crux of his position on the photos (officially) from the prohibited act of 'Running a Business' to an issue involving a sex-offender who also is on a CMP,

148. where after learning that the Plaintiff was gay and a sex-offender, as well the photos were of male-models, made Lt. Deloia very uneasy.

149. Therefore, the change in the crux of Deloia's position was the result only because of discrimination and deliberate indifference.

150. No incident report was issued for 'Running a Business.'

151. Plaintiff explained to Lt. Deloia that "these photos had just recently been ordered, arrived to the mailroom, scrutinized by the mailroom staff, then delivered to the Plaintiff, therefore they can no longer be considered contraband or inappropriate.

152. According to policy, Plaintiff explained to Lt. Deloia "that only a week prior when the photos were still being held in the mailroom for review and approval screening, that was the only appropriate time when the photos should have been (if deemed inappropriate or to be contraband) (a) rejected and then (b) returned to the publisher."

153. Had the correct policy and procedures been followed,

    (a) not only would rejected photos have been properly returned to the publisher (thereby eliminating the responsibility from the Plaintiff and..
    (b) the charges for the photos to the inmate would have been credited back to the inmate through the publisher.

154. However, despite policy, Lt. Deloia caused the Plaintiff a loss by

    (a) keeping the photos and then discarding them once Plaintiff refused to mail them home,
    (b) Plaintiff asked they be retained as evidence in the matter for these court proceedings,
    (c) Policy indicates that the (alleged) contraband be kept until the grievance procedure is exhausted,
    (d) Policy also indicates that when personal property, that was once approved but later deemed contraband, the Plaintiff is to be given an opportunity to send it home, and if he cannot afford it, it will be sent at government expense.

155. Lt. Deloia spred rumors to his staff that not only was the Plaintiff gay but that he was caught having "naked" guy pictures in his possession (according to CO John Does 1 and 2).

156. Afterwords, CO John Does 1 and 2 approached the Plaintiff and asked him about the gay photos, trying to not laugh directly at the Plaintiff, but instead drawing more intentional attention to the matter.

157. Also, the same two CO's (John Does 1 and 2) asked the Plaintiff several questions about the photos, including, "was the rumors true?" and asking the Plaintiff if he was "that way?"

158. The events contained and referenced from paragraphs 156 and 157 each occured while in front of other inmates.

159. Plaintiff was asked these questioned in a very unprofessional and inappropriate manner.

160. In any prison environment, an inmate is never asked about his sexuality unless that person asking is showing interest in that person sexually.

161. Doing so places that inmate at risk for sexual assault or at a minimum sexual harrassment from other inmates or staff.

162. Said two officers (John Does 1 and 2) told the Plaintiff, "No fags allowed here!" while laughing at the Plaintiff as he was walking away from them.

163. For these reasons stated above (cheifly in paragraphs 156 and 157) the Plaintiff filed a 'Sensitive-9' (which is a BP-9 considered to be too sensative to submit to the local administration) to the Regional director alleging a PREA violation of PS § 1330.18, 42 U.S.C. § 15606, 28 C.F.R. § 115, which neccesitated a complaint to be filed by the Plaintiff against Lt. Deloia, in that he disclosed to his subordinate employees that the Plaintiff was a gay inmate and that he possessed 'gay' photos.

15

164. Additionally, these facts are elligible to be reported as a First Amendment Discrimination claim due to the fact that Lt. Deloia mocked and belittled the Plaintiff for said male model pictures due to the appearance of them being 'gay.'

165. Plaintiff's Sensative-9 was rejected by the Regional Office and returned, claiming the issue was <u>NOT</u> "sensitive" nor a PREA violation and that the complaint was rejected, offering the Plaintiff only to refile it at the institutional level.

166. On 10/7/2015 Plaintiff submitted a request for all alleged faulty, alleged, untrue, inflammatory, defaming SOMP records to be expunged, via a new ARR #_____.

## 7. INTER-LIBRARY LOAN DISCRIMINATION

167. The I.L.L. program is a program where inmates can request books from other libraries.

168. I.L.L. books come from a large pool of libraries in the state-wide library system.

169. Over the past 1 full year since August 2015 every gay-themed book Plaintiff requested from the Inter-library loan program was rejected.

170. Mr. Meade, (Education Tech) at Marion USP is the staff person that runs the ILL program, including approving the requests and collecting and distributing the books.

171. In approximately 50 submissions over this time period, Mr. Meade has denied all of Plaintiff's book requests (except for a book on font styles).

172. Upon random review of his SOMP records, Plaintiff found that on 4 or more occassions Mr. Meade sent the SOMP Department notices of the Plaintiff's alleged "inappropriate" and/or "potentially risk-relevant" book selections/requests.

173. Meade stated in said SOMP records that these titles "were not congruent to the SOMP mission."

174. Mr. Meade is not employed or licensed in SOMP matters.

175. Mr. Meade violates <u>PS § 1542.01</u>, Employee Code of Conduct, BOP Discrimination Policy, BOP Harrassment Policy and the Fifth Amendment of the U.S. constitution where he violates Equal Protection rights.

176. Mr. Meade is not qualified to determine if something represents "potentially risk-relevant material."

177. Mr. Meade takes a great deal of time to determine if he should allow certain books or not, including searches online reviews.

178. Ms. Castellano warned Plaintiff to be a bit more careful when submitting a title.

179. Plaintiff copied the titles from a periodical to the request form and does not have a book review to gauge its content, topics, or details.

180. Plaintiff contends that it is nearly impossible to detect a books' appropriateness based upon its title, such as some of the following requested by the Plaintiff:

    (a) Probation
    (b) Me
    (c) Letter From Point Clear
    (d) Danube Divide
    (e) Terre Haute
    (f) A Secret Edge
    (g) Harvard Square

181. There were several more titles that are completely ambiguous, where no inference can be drawn based on title alone.

182. Inmates have no Internet access whatsoever and therefore cannot read book reviews before making selections for the ILL program.

183. For these reasons Plaintiff asked Dr. Cook to remove these referrals to SOMP by Mr. Meade, as they are inappropriately done and not according to any proceedure or policy, however Dr. Cook refused.

184. In October, 2016 Plaintiff submitted a request to the SOMP Department, asking them to remove his CMP, since he was elligible for its removal every 12 months.

185. Not only was Plaintiff denied this request, but the reason was in large-part due to the referals sent to SOMP from Mr. Meade.

186. SOMP staff (Courtney Dunning) labeled those referrals sent by Mr. Meade as documented "violations."

187. Plaintiff maintains his ILL book requests did not violate his CMP.

188. Plaintiff contends that these restrictions violate his constitutional rights, violating his Freedom of Speech and violation of his right to live free of Discrimination.

## B. MEDICAL RELATED FACTS

### 1. INACCURATE MEDICAL RECORDS

189. Plaintiff alleges that since arriving at USP Marion (8/3/2015) he has endured Cruel and Unusual Punishment consisting of Deliberate Indifference to his serious medical needs.

190. Plaintiff has Hammertoe Syndrome.

191. Plaintiff has reported to sick-call several times for pain related to his HTS.

192. Plaintiff asserts his consistant and constant requests for relief of pain regarding his HTS and other documented chronic-care problems in his hip/leg/foot/toes/etc., have gone ignored and untreated.

193. Plaintiff had been transferred out of FMC Devens around May 2013.

194. Plaintiff had received approvals from the Utilization Review Committee for consults (with outside doctors and specialists regarding orthopedic surgeons) for his HTS, and

195. Plaintiff was approved for a consult with a Pain Management specialist for chronic-care and constant pain,

196. As well as a plastic surgeon regarding the 'staining' and other deformities.

197. When he arrived at Englewood FCI Plaintiff had to re-establish his "severe impairments."

198. Dr. Kraus refused to honor the Plaintiff's diagnosis.

199. Dr. Kraus disregarded Plaintiff's pain levels as reported to him.

200. Dr. Kraus further cancelled the Plaintiff's previous approved consults.

201. Upon arriving at USP Marion, the Medical Department did not realize there were once approved consults (via the URC),

202. nor did medical staff at Marion recognize the severity or urgency of Plaintiff's actual condition,

203. and failed to make proper interpretation of Plaintiff's serious medical needs.

204. Plaintiff reported his pain several times over several clinical encounters.

205. However, each time Plaintiff's pain went untreated and ignored.

206. Medical staff report that my pain is managed appropriately with the psychological drug Elivil.

207. Plaintiff contends that this drug is not enough help to bare the pain as constant and as consistent as it is and that his pain is **NOT** managed appropriately.

208. Plaintiff was seen not using his cane while in chow hall line.

209. Therefore, in approximately September 2015 the medical Department decided they will remove the Plaintiff's cane and its approved status from his Medical Duty Status sheet.

210. Plaintiff argued that he indeed needed his cane as recommended by his surgeon(s), not to rely solely on a cane and not to use it as often as could be tolerated.

211. Plaintiff was warned that he has "'drop-foot' and that use of the cane would increase the degenerative symptoms (chances to occur), while not using his cane on occassion would help keep strength in his foot for a longer period of time."

212. Defendants Harbison and Bagwell were intentionally hassling the Plaintiff and looking for a way to cause the Plaintiff distress,

213. Defendants Harbison and Bagwell succeeded such by removing his cane stating that "[Plaintiff] obviously doesn't need it."

214. Defendants Harbison and Bagwell are not medically trained, instead they are administrators for the Health Care/Medical Dept.

215. Several chronic ailments have treatments and procedures easily proven to be effective, specifically surgery to cure Plaintiff's HTS, which is available, however, not offered to the Plaintiff.

216. Plaintiff saw PA Brooks several times regarding his painful toes, which he continuously stated "I'll see if Dr. Pass wants to do something."

217. However, nothing was ever done, until the Plaintiff pushed for medical attention to his problems. Despite the appearance that some medical procedure will be tried, nothing was done for the Plaintiff to correct his deformities or sooth his pain.

218. At his visit to PA Brooks on (approximately) May 2016, she asked the Plaintiff "why didn't they [former BOP institutions] do something for your HTS before before you came here?"

219. Plaintiff continues to seek relief for pain and correction of his deformities and makes sporatic visits at sick-call as needed, althoughwithout anything done differently for the pain.

220. Plaintiff is even charged a co-pay for these repeated "chronic-care" related visits to Medical.

221. Plaintiff attending sick-call is only resulting is reporting his pain level (usually a 6 or 7), without nothing being treated is merely continuing the same ineffective treatment (or rather NON-treatment) and deliberately prolongs pain and side-effects.

222. Plaintiff has asked several times, at each and every appoint-ment, to be able to see Dr. Pass so he could push his issues to be able to see outside specialists for approved consults.

223. Plaintiff was finally scheduled to see a podiatrist.

224. Said podiatrist made several recommendations, including that Plaintiff receive the following:

> (a) See a peripheral nerve specialist for relief of nerve pain.
> (b) See an orthopedic surgeon for the non-union (tibia and fibula).
> (c) Attend Pain Management.
> (d) See a surgeon for the purpose of having HTS corrective surgery.

225. Due to there being various treatments, procedures, medications, assisting devices, therapies, etc. to treat Plaintiff's serious chronic care problems, Plaintiff expected to be helped, however,

226. No adequate or effective treatments have been deployed, and all recommendations made by the podiatrist have been declined.

227. The Bureau of Prisons ("BOP") is a defendant, acting as an agent, or bureau, under the authority of the Department of Justice, which is also an entity of the government of the United States.

228. The BOP has had the knowledge, but failed to use the skill and care ordinarily possessed and utilized through practive by members of the profession in good-standing.

229. A medical doctor is required to provide patients with enough information about the risks and benefits of medical treatments and then the patient should use such information to decide if he would like to submit to treatment.

230. The Clinical Director, Dr. Pass, knew, or should have known, that the Plaintiff's serious medical needs were going unattended and no further treatment, then or in the future, was planned or discussed.

231. There exists the evidence to Construe Plaintiff's pain and chronic condition(s) as being "serious medical needs" where treatment was previously suggested by a physician and where treatment was mandated by a doctor and remains obvious to even a layperson that treatment is needed.

232. The infliction of pain in the Plaintiff's right foot/leg is important as it has a major impact on the Plaintiff's daily routine of activities.

233. The Plaintiff also suffers from several types of pains in his toes, foot, ankle, shin, knee, theigh, hip, back and neck that all stem from the assault he suffered while in the care of the BOP.

234. The Plaintiff alleges that the aforementioned affected areas of pain are either being ignored or treat ineffectively and inadequately with the same medicine he has been on for years, however ineffective.

235. Plaintiff's serious medical needs do impact and limit Plaintiff's activity and keeps Plaintiff confined to mostly indoor activity and limiting his exercise ability.

236. Plaintiff has been living with serious chronic pain each day without relief.

## 2. DISCONTINUANCE OF REQUIRED MEDICATION

237. Plaintiff is inflicted with Restless Leg Syndrome with Periodic Limb Movement ("RLS-PLM") or ("RLS").

238. RLS is a progressive disease,in the case of this Plaintiff, is worsening over time.

239. Plaintiff has suffered with RLS-PLM since he was a small child.

240. As the result of RLS-PLM, Plaintiff suffers intense twinges, at times engrossing his entire body, where pain, agony, and sensations of intense physical discomfort, cause him to be unable to enter into a relaxed state in order to find rest or relaxation, and certainly prohibits him from any meaningful sleep.

241. RLS and PLM both cause spasms that can be as bad and intense as ocurring within 1-4 seconds apart from each other.

21

242. Symptoms of RLS-PLM usually occur in one leg or arm at a time, however, often times occurs in both legs and arms, or any other combination simultaneously.

243. Symptoms of RLS-PLM will spasm intensely for a duration of approximately 4 hours in duration without relanting.

244. These spasms, muscular tension, jolts of uncontrollable movements, severe discomfort (both physically and emotionally), severe fatigue, drastically increased stress (including psychological distress, feelings of being distraught and in turmoil.

245. PRAMIPEXOLE is the only known effective medication for this Plaintiff to manage his RLS-PLM.

246. Plaintiff has been on this medication for several years, without issue and experienced successful relief.

247. However, on or about 6/2/2016 Plaintiff's pramipexole was discontinued suddenly and without warning or notice.

248. Not having the medication and suffering needlessly from severe symptoms while he was confined to the SHU.

249. Being confined to the SHU, Plaintiff was unable to sit or lay down for much of the time due to his symptoms, discomfort and agony.

250. Plaintiff was essentially forced to remain standing upright all throughout the evenings and over-night hours, as well as much of the daytime hours because of incessant symptoms.

251. Plaintiff was unable to walk more than 2 steps without being confined by his cell, and therefore denied him the ability to try to walk-off his symptoms.

252. Having uncontrolled symptoms without medication causes the Plaintiff to be exceedingly distraught and dehabilitated.

253. Plaintiff asserts that RLS-PLM is cause for suffering from the physical effects of said disease and from the extreme deminished quality of life, where Pramipexole can restore everything back to normal (physically) for Plaintiff.

254. Pramipexole is non-narcotic, non-toxic, and not addictive, whereby it does not give the Plaintiff side-effects.

255. RLS-PLM are chronic diseases where records of Plaintiff having this disease and known medical condition since birth.

256. Plaintiff was in the care of neurologists prior to incarceration whom had performed sleep studies and tests which diagnosed the disease and prescribed proper medication as a teenager.

257. Where not only was a life-long record established, but the BOP additionally had their own sleep studies performed while at a BOP facility, in Butner FMC, which produced its own documented account of the existence of the disease.

258. These conditions were known to be the health condition of the Plaintiff upon his arrival into the custody of the BOP.

259. BOP had also erroneously stopped Plaintiff's Pramipexole medication around the same time in 2015 as well, and without reason.

260. It wasn't until arriving at Marion USP before Plaintiff was again despensed his Pramipexole, August 8, 2015.

261. Plaintiff has experienced long delays of over 15 weeks without his medication which treated his RLS-PLM effectively.

262. Said sudden and unexpected stoppage of this much needed medication caused Plaintiff to want to hoard very small amounts over the prior 10+ months amounting to enough to supply him 1 month supply for the period of time trying to get his medication back again.

263. Plaintiff's actions were done only as a result of prior experiances in the BOP and their lack of care for the turmoil caused to him while they punish him without his Pramipexole.

264. Medical Department staff insisted they were unable to refill the prescription for Pramipexole because the medication was being denied at the Central Office in Washington, DC.

3. DENIAL OF TREATMENT

265. Some time in August 2016 Plaintiff was approved to see a podiatrist for a consult regarding various medical concerns.

266. It took the Plaintiff to file an Administrative Remedy before it was considered that he should see a specialist for his Hammertoe Syndrome and approved said podiatrist appointment.

267. At the consult the podiatrist discussed the recommendations he would suggest to the BOP for the proper treatment be believed the Plaintiff should have, as follows:

    (a) A referral to Pain Management.
    (b) A referral to a Peripheral Nerve Specialist.
    (c) A referral to an Orthopedic surgeon to correct his HTS.

268. Plaintiff received a notification telling him that his referral for surgery was denied.

269. Plaintiff went to PA Brooks to discuss the rejection to the Orthopedic surgeon since ther was no reject reason given.

270. PA Brooks told the Plaintiff she had no "reject reason" listed.

271. Plaintiff filed an ARR (#880400-F1) sometime immediately after seeing PA Brooks.

272. The response to ARR #880400-F1 yeilded an explaination for the denial(s), amongst them was:

    (a) "due to the significant risk of infection associated with the procedure."
    (b) and that the HTS corrective surgery was "elective."
    (c) that Plaintiff's pain is being managed locally with a drug for the treatment of depression, etc, Elavil.
    (d) that there is a chance possibility that Plaintiff's pain could remain or even worsen.

273. Plaintiff repsonded to the Warden's response to Regional Director that the risk for infection accompanies every single operation that takes place in the world.

274. Plaintiff further asserts that this reason, or rather, warning, is a factor which is to be considered when providing informed consent.

275. However, this is not an expedient the BOP can advance to deny medically justified treatment.

276. A medical doctor in the community recommended a procedure which has a good chance of reducing Plaintiff's pain and improving his mobility.

276. Plaintiff reminded the BOP, in his complaints, that he was assaulted while in BOP custody where his injuries were acquired.

277. In these complaints Plaintiff asserted negligence created the opportunity for Plaintiff to be attacked.


## 4. DENIAL OF ACCESS TO THE COURTS


278. Plaintiff has requested on several occassions, the resources necessary to properly file his Federal Tort Claims, per the laws of the state in which the acts or ommissions occurred.

279. The Education Department staff have repeatedly denied the Plaintiff's requests for state tort law information, stating that "Bureau of Prisons is not mandated to provide state case law and other state legal materials regarding FTCA.

280. The Plaintiff asked staff for resources concerning Colorado and Illinois state statutes on tort law, but was told that (a) they did not have time and (b) they are not required to do so and gave the Plaintiff an affirmative 'NO!'

281. Plaintiff is unable to properly comply with the filing requirements of the state(s) in which the tort or the common law exemptions were occurring.

282. Plaintiff also has several examples of Legal Mail that has been delivered by the Housing Officer, which means that it was opened and read, as is all regualr mail.

283. Only "Legal" and "Special" mail is delivered unread, but has to be opened by staff with the inmate is present.

284. Approximately 8-15 court documents were opened without Plaintiff present and delivered through regular delivery means despite the stamped message on the court envelopes stating, "SPECIAL MAIL-OPEN IN THE PRESENCE OF THE INMATE."

285. The stamp with said message is in red color.

286. Plaintiff issued the mailroom written warning(s) that they were opening his mail improperly, as well as in-person visits to the mailroom counter.

287. Plaintiff contends that his complaint and concerns which violated his constitutional rights went unheard.

288. Plaintiff noticed that the same actions have not ceased.

## V. LEGAL CLAIMS

### COUNT ONE

Plaintiff asserts his <u>FIFTH AMENDMENT</u> right to <u>EQUAL PROTEC-TION</u> under the law was violated, where some CMP's are based upon an inmates (a) Pre-Sentencing Investigation Report and (b) their 'Initial-Risk Assessment,' while others, such as the Plaintiff's are not. The Plaintiff avers the defendants and facts which are adopted and incorporated from paragraphs 35-57, 58-91, 92-100, 101-114, 115-166 and 167 through 188, herein by reference as fully set forth herein.

### COUNT TWO

Plaintiff asserts his <u>FIRST AMENDMENT</u> right to be free from <u>RETALIATION</u>, was violated by and through several incidents conducted by staff, both in the applicable areas of SOMP related and medically related portions of this complaint. Plaintiff avers the defendants and the facts adopted and incorporated in paragraphs 35-57, 58-91, 92-100, 101-114, 115-166, 167-188, 189-236, 237-264, 265-277, 278-288 herein by reference as fully set forth herein.

### COUNT THREE

Plaintiff asserts his right to be free from the <u>TORTIOUS</u> violation of <u>DEFAMATION</u> was violated where defendants damaged his name and image of character through lowering the estimation of the Plaintiff in the minds of others based upon defamatory and slanderous comments into Plaintiff's SOMP records. Said enteries were written with the full intent of the reader to make a negative determination about the Plaintiff when interacting or making future determinations with or for the Plaintiff, or upon deciding if or how severly to punish the Plaintiff. Faulty records made to look horrendous, are blown out of proportion, outside of factual relevance, and used to inflict intentional harms or damages, or at least strong difficulties at a minimum for the Plaintiff. Therefore, the Plaintiff avers the defendants and facts as adopted and incorporated in paragraphs 35-57, 58-91, 92-100, 101-114, 115-166 and 167 through 188, herein by reference as fully set forth herein.

*/ / /*

## COUNT FOUR


Plaintiff asserts his FIRST AMENDMENT rights to FREEDOM
OF SPEECH AND EXPRESSION were violated by defendants by way
of prohibiting his communications to and from pen-pals, by possessing
non-nude pictures of male models that were approved and delivered
by the mailroom staff upon being individually scrutinized, only
to then be the cause for the Plaintiff to be written an Incident
Report for the possession of contraband, by stopping many of
his liberty interests and activities, by restricting his right
to select books and reading materials to which he identifies
with (gay themed), by prohibiting him from maintaining interest
in males, by not allowing him to express his sexuality (preference),
and other examples.  The Plaintiff avers the defendants and
facts which are adopted and incorporated in paragraphs 35-57,
58-91, 92-100, 101-114, 115-166 and 167-188, herein by reference
as fully set forth herein.

## COUNT FIVE


Plaintiff asserts that he was (and is) being unfairly singled
out for mistreatment, but which is not based on typical discrimina-
tory factors like race or gender, for example, but where he
declares himself part of a quasi-class (or suspect class), being
he is an open homosexual and also a known sex-offender.  Plaintiff
claims that he was singled out, mostly by eliminating his equality
among all other inmates through an unjust and ill-regulated
CMP which infringes upon a large number of constitutionally
protected rights or results in conditions of confinement that
are much worse than is normal for prisoners.  Therefore, his
FIFTH AMENDMENT right to [PROCEDURAL] DUE PROCESS was violated,
thereby presenting his EQUAL PROTECTION claims herein, was perpe-
trated by defendants as described in the facts and adopted and
incorporated paragraphs 35-57, 58-91, 92-100, 101-114, 115-166,
and 167 through 188, herein by reference as fully set forth
herein.

## COUNT SIX


Plaintiff asserts his FIFTH AMENDMENT right to EQUAL PROTEC-
TION based upon his sexual-orientation as being a 'quasi' or
'suspect' classification member.  Defendants displayed a discrimin-
atory effect with the intent to bring the Plaintiff ill-treatment
and inequality by and through his CMP being focused on prohibiting
common activity of any inmate, especially of a gay inmate, while
decreasing their estimation of him in the minds of staff who
interact with the Plaintiff, holding Plaintiff to unfair standards

restricting the Plaintiff's liberty interests, continuously
writing up the Plaintiff, denying him materials that heterosexual
inmates are able to have, and other similarly discriminatory
acts due to him being a gay man, such as being mocked and degraded
for his sexual identity and other forms of misconduct.  The
Plaintiff avers the defendants and facts adopted and incorporated
in paragraphs 35-57, 58-91, 92-100, 101-114, 115-166 and 167
through 188, herein by reference as fully set forth herein.


## COUNT SEVEN


Plaintiff asserts that his EIGHTH AMENDMENT right to be
free from MEDICAL NEGLIGENCE, being that the Plaintiff is a
ward of the federal government through the Department of Justice
and by the Bureau of Prisons, which has allowed an employee
of the Education Department [Meade], at the U.S. Penitentiary
Marion to act in a way that is reserved by a medical doctor,
where he made determinations in a psychological manner upon
the Plaintiff's Psychology Department's records, where he has
no certification or authority to make such clinical assertions
or determinations.  The Plaintiff avers the defendants and facts
which are adopted and incorporated in paragraphs 167-188, herein
by reference as fully set forth herein.


## COUNT EIGHT


Plaintiff asserts his FIFTH AMENDMENT right to DUE PROCESS
and DENIAL OF ACCESS TO THE COURT by and through the actions
where his book requests submitted to an "Inter-Library Loan"
program were reported to the SOMP staff who took the position
that siad titles were intentionally requesting inappropriate
topics and did not tell the Plaintiff said referrals were being
made, or that they included such damaging information to his
records, and that were later used to cause harm to the Plaintiff
through extending his CMP by another 1-year due to said "additional
violations," per SOMP staff.  Plaintiff was (and is) never given
the opportunity to defend his actions until after the damage
was done to his records, which are permanent.  The Plaintiff
avers the defendants and facts are adopted and incorporated
in paragraphs 35-57, 58-91, 92-100, 101-114, 115-166 and 167
through 188, herein by reference as fully set forth herein.


///


28

## COUNT NINE

Plaintiff asserts his rights under the <u>PRIVACY ACT</u> were violated, a <u>TORTIOUS</u> act, by the BOP, pursuant to <u>TITLE FIVE</u> (5 U.S.C.S. <u>§552a(e)(5)</u>)whereby Plaintiff Houck's SOMP records were intentionally inaccurate to cause damages via prohibiting him from his liberty interests and where determinations were made based upon these records, where the law states, "each agency that keeps a system of records must do so with such accuracy, relevance, timliness and completeness, as is reasonably necessary to assure fairness to the individual in making a determination." The relevant defendants and facts are adopted and incorporated from paragraphs 35-57, 58-91, 92-100, 101-114, 115-166 and 167 through 188, herein by reference as fully set forth herein.

## COUNT TEN

Plaintiff asserts his rights under the <u>FEDERAL PRIVACY ACT</u> were <u>TORTIOUS</u> violations by the BOP pursuant to <u>TITLE V</u> of the United States Code Service <u>§552a(e)(5)</u> whereby Plaintiff's medical records do not accurately depict his pain, deformities and other chronic-care medical issues as the severity is not recognized or treated accordingly, where he is living each day with serious chronic pain without relief, indirectly causing the damages from <u>FAILURE TO TREAT OR CURE</u>. The relevant defendants and facts are adopted and incorporated from paragraphs 189-236, 237-264, 265-277, 278-288, herein by reference as fully set forth herein.

## COUNT ELEVEN

Plaintiff asserts his rights under the <u>EIGHTH AMENDMENT</u> were violated by way of <u>FAILURE TO TREAT OR CURE</u>, which is a <u>CRUEL AND UNUSUAL PUNISHMENT</u> claim based upon the discontinuation of the Plaintiff's medically necessary medication. The relevant defedants and facts are adopted and incorporated from paragraphs 189-236, 237-264, 265-277, 278-288, herein by reference as fully set forth herein.

## COUNT TWELVE

Plaintiff asserts his rights to be free from <u>OFFICIAL MISCON-DUCT</u>, a <u>TORTIOUS</u> violation, where Plaintiff avers the defendants and facts are adopted and incorporated from paragraphs 35-57, 58-91, 92-100, 101-114, 115-166, 167-188, 189-236, 237-264, 265-277 and 278-288 herein by reference as if fully set forth herein.

## COUNT THIRTEEN

Plaintiff asserts his rights and protections afforded him according to the <u>AMERICAN REHABILITATION ACT</u> (29 U.S.C.S. §701 et seq.) were <u>TORTIOUS</u> violations where the Plaintiff avers the defendants and facts and are adopted and incorporated from paragraphs 189-236, 237-264, 265-277, 278-288, herein by reference as fully set forth herein.

## COUNT FOURTEEN

Plaintiff asserts his <u>EIGHTH AMENDMENT</u> right to receive <u>MEDICAL TREATMENT</u> was violated (and is still being violated) by and through <u>FAILING TO TREAT OR CURE</u> by withholding **treatments,** procedures which suggests/shows <u>CRUEL AND UNUSUAL PUNISHMENT</u> claim meets the standards for <u>DELIBERATE INDIFFERENCE</u>, where the defendants and facts are adopted and incorporated in paragraphs 189-236, 237-264, 265-277, 278-288, herein by reference as if fully set forth herein.

## COUNT FIFTEEN

Plaintiff asserts his <u>EIGHTH AMENDMENT</u> right to receive <u>MEDICAL TREATMENT</u> was violated (and is still being violated) by and through <u>FAILING TO TREAT OR CURE</u> by withholding Plaintiff's necessary **medication,** which shows and/or suggests <u>CRUEL AND UNUSUAL PUNISHMENT</u> as a claim, and meets the standards for <u>DELIBER-ATE INDIFFERENCE</u>, where the Plaintiff avers the defendants and facts are adopted and incorporated in paragraphs 189-236, 237-264, 265-277, and 278 through 288, herein by reference as fully set forth herein.

## COUNT SIXTEEN

Plaintiff asserts his rights to be free from <u>NEGLIGENCE,</u> <u>GROSS MEDICAL NEGLIGENCE</u> by and through the <u>TORTIOUS</u> violations of both denying the Plaintiff required medication and failing to afford him the corrective procedures he requires for his serious medical needs, as recommended by a medical doctor from the community. Plaintiff avers the defendants and facts are adopted and incorporated in paragraphs 189-236, 237-264, 265-277, 278-288, herein by reference as fully set forth herein.

/ / /

## COUNT SEVENTEEN

Plaintiff asserts his rights to be free from the <u>WILFULL</u> and <u>WANTON MISCONDUCT</u> come in addition to the claim of <u>NEGLIGENCE</u> and its elements in their ordinary form, as either a deliberate intention to harm or an utter indifference to or conscious disregard for the welfare of the Plaintiff, which are <u>TORTIOUS</u> violations. The Plaintiff avers the defendants and facts which are adopted and incorporated in paragraphs 189-236-237-264, 265-277, and 278-288, herein by reference as if fully set forth herein.

## COUNT EIGHTEEN

Plaintiff asserts his rights to be free from the <u>TORTIOUS</u> act of <u>AIDING & ABETTING</u>, where fellow staff support and help each other, all while maintaining a code amongst themselves to always support their fellow staff, an "US" vs. "THEM" mentality, despite the wrongs done by one or more of them, as to cover up the incident. In many ways aspects this <u>TORTIOUS</u> act is also a <u>CONSPIRACY</u>. The Plaintiff avers the defendants and facts which are adopted and incorporated in paragraphs 35-57, 58-91, 92-100, 101-114, 115-166, 167-188, 189-236, 237-264, 265-277 and 278 through 288, herein by reference as fully set forth herein.

## COUNT NINETEEN

Plaintiff asserts his right to be free from <u>OUTRAGEOUS CONDUCT</u> via the <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS-(IIED)</u>, where such <u>TORTIOUS</u> acts included sanctioning Plaintiff Houck, implementing several discriminatory restrictions based upon his known-faulty records and controlling documents resulting in determinations based on records known to be highly contested, built by staff to assemble reason for creating a CMP based off bad information rather than the proper elements required by policy. Plaintiff avers the defendants and facts are adopted and incorporated in paragraphs 35-57, 58-91, 92-100, 101-114, 115-166 and 167 through 188, herein by reference as fully set forth herein.

## VI. RELIEF

Plaintiff asks this Honorable Court to award Plaintiff $1,000,000 compensatory, $1,000,000 punitive and $1.00 nominal damages for each constitutional violation committed for each defendant involved, and likewise for each tortious violation perpetrated by each individual named.

I swear all of the foregoing contained in this Complaint is true and correct under penalty of purjury

This 23rd day of December, 2016.

Kenneth Houck

⬌06743-015⬌
Kenneth Houck
#06743-015
United States Penitentiary
PO Box 1000
Marion, IL 62959
United States

Kenneth Houck #06743-015
U.S. Penitentiary
PO Box 1000
Marion, IL 62959



\*\*\* LEGAL MAIL \* \* \*

⬌06743-015⬌
Clerk Of The Court
750 Missouri AVE
United States Courthouse
E Saint Louis, IL 62201
United States



MAIL CLEARED
US MARSHALS



Warden
United States Penitentiary
Marion, IL 62959
Date: DEC 2 4 2016

The enclosed letter was processed through
special mailing procedures for forwarding to you.
The letter has neither been opened nor inspected.
If the writer raises a question or problem over
which this facility has jurisdiction, the materials for
you may wish to return the materials for
further information or clarification.
If the writer encloses correspondence for
forwarding to another address, please return
the enclosure to the above address.